IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL J. D'ANGELO, ) | |
| ) | |
| Plaintiff, ) | Case No. 19 C 6041 |
| ) | |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| THOMAS J. DART, in his official capacity, as ) | |
| Cook County Sheriff, and COOK COUNTY, as ) | |
| Indemnitor, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael J. D'Angelo, a Cook County Deputy Sheriff, has brought a two count amended complaint against his employer Thomas Dart in his official capacity as Cook County Sheriff, and Cook County as indemnitor. Count I is a claim for discrimination and failure to accommodate under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq. Count II alleges a claim for unlawful retaliation under the ADA. After defendants moved for summary judgment on both counts, plaintiff dropped his retaliation claim. For the reasons described below, defendants' motion for summary judgment on count I is granted and judgment is entered for defendants.

## BACKGROUND

Defendant Dart hired plaintiff as a deputy sheriff on February 17, 1998. Deputy Sheriffs are deputized, sworn officers. They work in the Court Services Department and their duties include providing security to all seventeen courthouses with the Circuit Court of Cook County, Illinois. Deputy sheriffs bid to a location (courthouse), shift, and detail (days off). There are various assignments in each courthouse, but deputies do not bid on specific assignments.

The Cook County Sheriff's Office ("CCSO") maintains a written job description for the deputy sheriff position. That description lists seventeen essential functions of the position:

1) Maintain security and order of all courthouses;

2) Effectively communicate and interact with detainees/arrestees, courtroom staff, and members of the public;

3) When necessary, physically engage with citizens, detainees/arrestees, and courtroom staff (front door security, lock ups, courtroom remands, internal roving security, external roving security) in order to maintain the safety and security of all courthouses;

4) Conduct physical searches of both people (public and detainees/arrestees) and areas of assignment (courtrooms, front door security, lock ups, building, exterior perimeter, etc.). Includes the ability to effectively stand, walk, bend, stoop, kneel and lift/move arms. Also includes the ability to stand unassisted for prolonged periods of time as required in the performance of courtroom, lock up, and security assignments, and CCSO policy;

5) Supervise detainees, including groups of detainees, and transport them to and from Court;

6) Operate entry screening equipment and work at assigned standing security posts unassisted for prolonged periods of time; often an entire 8-10 hour shift;

7) Interact with, search, secure, and transport detainees/arrestees for both internal and external movement, such as court movement, lock up movement, intake, hospital runs, etc.;

8) Engage in physical force as necessary and outlined in the progressive steps of the CCSO use of force policy, as well as communicate effectively to de-escalate, mitigate, and prevent potential use of force situations when able;

9) Perform security functions, and respond quickly to emergency situations; including bending, crouching, kneeling, running, lifting, and twisting;

10) Conduct visual security assessments, which include physical capabilities such as bending, twisting, kneeling, crouching and walking both interior and exterior perimeters of courthouse buildings for prolonged periods of time;

11) Enter, exit, sit in, and drive CCSO vehicles for prolonged periods of time based on area of assignment;

12) Qualify annually with a duty weapon while wearing a duty belt as required by CCSO policy;

13) Wear required safety equipment and duty uniforms as required by CCSO policy such as vest, taser, body camera, radio, etc.;

14) Effectively write narratives, enter data into required computerized systems, and complete all required reports, logs, and supplemental documents;

15) Utilize computes to check emails, review and comprehend trainings, policies, directives and compliance mandates;

16) Respond to an "all call" situation; and

17) Work any shift and location and be available to work additional consecutive shifts based on operational needs.

In 2008 and 2010 plaintiff injured his right wrist while on duty. He was on injured on duty ("IOD") leave for much of that time. He reached maximum medical improvement ("MMI") in 2012. When he returned to work in January 2012, he had several lifting and pulling restrictions, so he was assigned to work in a modified duty assignment at the loading dock of the District 3 courthouse located in Rolling Meadows, Illinois. In that assignment he was not required to

perform many essential functions of the job, including engaging with persons in custody, staff, and the public, which could require the use of physical restraint or searching persons or locations. Nor was he required to respond to an "all call" situation.

Plaintiff injured his rotator cuff in 2014, again while on the job. He was on IOD leave until he reached MMI and returned to work in August 2016 with restrictions from lifting weight greater than 34 pounds over his shoulder and 47 pounds at a lower level, carrying weight greater than 37 pounds, and pulling weight greater than 10 pounds. His doctor also restricted him from shaving in 2017, and he was restricted from prisoner contact, because of the risk that he could reinjure his wrist or shoulder. When he returned to work, he was again given the modified duty assignment at the loading dock at the Rolling Meadows courthouse.

In 2018 the CCSO was experiencing budget cuts and staffing issues. As a result, CCSO Human Resources ("HR") was asked to implement a plan to maximize its sworn workforce by examining the modified duty assignments. On September 14, 2018, Rebecca Reierson, Director of Employee Services for HR, sent a letter to all sworn officers, including plaintiff, who were working modified duty assignments or who had permanent work restrictions, seeking clarification of their restrictions and updated medical paperwork, if appropriate. Specifically, plaintiff's letter indicated that based on the medical information in the CCSO file, it "appears that you are unable to perform one or more of the essential functions of your position." The letter attached a copy of the job description and plaintiff's current restrictions. The letter then indicated that "[t]o continue in your current job title, you must be able to perform the essential functions, with or without a reasonable accommodation." The letter then gave plaintiff three options:

> 1) Present updated medical documents to HR indicating that he no longer had restrictions that prevented him from performing the essential functions of his

position with or without an accommodation;

2) Request a reasonable accommodation under the ADA. To elect this option plaintiff had to request and complete a "Reasonable Accommodation Request" packet. The letter specifically stated that "being assigned to an alternate assignment (i.e. desk duty) that does not encompass the essential functions of your job title is not considered a reasonable accommodation. If it is determined that based on your restrictions you cannot perform the essential functions of your position with or without a reasonable accommodation, HR will assist in determining if there is an alternative vacant position at the CCSO for which you are qualified"; or

3) If unable to perform the essential functions of his position under options 1 or 2, plaintiff could elect to take a skills assessment to determine if he qualified for another vacant position at the CCSO.

Finally, the letter indicated that plaintiff had to elect an option, even if he was currently working in an assignment that was within his restrictions and/or he believed he already had a reasonable accommodation.

Plaintiff elected to request an accommodation (option 2). He filled out the request form indicating that he did not have a physical or mental impairment that substantially limited one or more life activities. He also indicated that there were no essential functions that he could not perform because he was already being accommodated by his "ADA Post on dock," and that his limitations were not interfering with his ability to perform the essential functions of his job "as long as im [sic] assigned to my ADA Post on dock as I have been the last 6 years." Plaintiff's physician filled out the Essential Functions checklist, stating that plaintiff could perform the duties of physically engaging with citizens, detainees/arrestees, and courtroom staff with restrictions and also conduct physical searches of people and areas of assignment with restrictions. The physician indicated that plaintiff could not interact with, search, secure or transport detainees/arrestees, and that plaintiff should have no prisoner contact. Both plaintiff and his physician sought assignment

5

to the "ADA dock post" as an accommodation, even though Reierson's letter indicated that such a position would not be considered an accommodation.

After reviewing plaintiff's paperwork, HR and plaintiff discussed his accommodation request and restrictions. Because the physician indicated that plaintiff could not perform many of the essential functions, HR determined that plaintiff could not meet the essential functions of a deputy sheriff without an accommodation. HR told plaintiff that an indefinite assignment to a particular post was not a reasonable accommodation and discussed his other options. On January 31, 2019, Reierson requested that plaintiff take a skills assessment to see if there was a civilian position that met his restrictions. Plaintiff failed the skills assessment and refused training to improve his skills. He remained in his modified duty assignment from September 2018 when Reierson's letter went out, until February 13, 2019, when, afraid that he might lose his job, plaintiff submitted a full-duty release with no restrictions from his doctor. He did not seek any accommodation after he submitted the full-duty release.

Plaintiff returned to full duty work on February 13, 2019. Between that day and January 31, 2020, plaintiff rotated through various deputy sheriff assignments at the District 3 courthouse, including courtroom and entry screening. He performed all the essential functions of a deputy sheriff in these assignments.

On February 5, 2020, plaintiff suffered an injury to his neck and shoulder during in-service training. This injury was unrelated to his previous injuries. He filed an IOD claim, has been on IOD leave, and has not returned to work. He remains in his deputy sheriff title.

## **DISCUSSION**

Defendants have moved for summary judgment on plaintiff's ADA discrimination and/or failure to accommodate claim in Count I. Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. See CTL ex rel. Trebatoski v. Ashland Sch. Dist., 743 F.3d 524, 528 (7th Cir. 2014). But the nonmovant "is only entitled to the benefit of inferences supported by admissible evidence, not those 'supported only by speculation or conjecture.'" Grant v. Trus. of Ind. Univ., 870 F.3d 562, 568 (7th Cir. 2017).

Plaintiff's main claim is that defendants failed to accommodate his disability in 2018. To prevail on this claim he must establish that: "1) he is a qualified individual with a disability; 2) his employer was aware of his disability; and 3) the employer failed to reasonable accommodate the disability." EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 797 (7th Cir. 2005). The Act requires that the employer and employee engage in an interactive process to determine a reasonable accommodation. Id. If the employee shows that the disability was not reasonably accommodated, the employer will be liable only if it bears responsibility for the breakdown of the interactive process. Id.

7

Defendants argue that plaintiff cannot establish the first element. Defendants first argue that plaintiff did not have a disability because both he and his doctor indicated that plaintiff did not have a physical or mental impairment that substantially limited one or more major life activities, the definition of disability in the ADA. 42 U.S.C. § 12102(2). Although there is some merit to this argument, for purposes of the pending motion the court will assume that defendant regarded plaintiff as having such an impairment based on his history of work related injuries. That is as far as plaintiff gets, however, because the record establishes that plaintiff was not a qualified individual.

A "qualified individual" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The plaintiff bears the burden of proof to establish that he is a qualified individual. Cochrum v. Old Ben Coal Co., 102 F.3d 908, 912 (7th Cir. 1996).

In 2018 when plaintiff received Reierson's letter, he was working with various restrictions that prevented him from performing many of what he has admitted are essential functions of a deputy sheriff, including escorting detainees, interacting with prisoners, and engaging physically with persons. He could not respond to an "all call" situation under his physician's restrictions. As a result, he could not be assigned anywhere except the loading dock. After he responded to Reierson's letter by requesting an accommodation, he still indicated that he had restrictions that prevented him from performing many of the essential functions of the job. He asked to be placed permanently at the loading dock, but the letter clearly indicated that an indefinite assignment to a particular post would not be considered a reasonable accommodation.

Plaintiff argues that he could perform all of the essential functions of a deputy sheriff assigned to the loading dock. What he is really arguing is that by allowing him to remain in a light duty assignment while recovering from injuries sustained on duty, defendants conceded that some of the listed job functions were actually "non-essential" to performing as a deputy sheriff. Accepting this position would mean that whenever an employer allows an employee to work in a temporary light duty position it would be opening a factual question as to whether the essential functions of the original position, which the employee's restrictions prevented him from performing, were actually essential. As a result, "employers would stop offering temporary light-duty assignments to accommodate temporary disabilities, fearing that their temporary elimination of certain essential functions of the job for those temporarily-disabled employees would force them to make their elimination permanent." Williams v. Eastside Lumberyard and Supply Co., Inc. 190 F. Supp. 2d 1104, 1113-14 (S.D. Ill, 2001).

In any event, when he asked for an accommodation, defendants started the interactive process by consulting with plaintiff about possible assignments. When he was told that a permanent assignment to the loading dock was not an option, defendants asked him to take the skills assessment to determine if he could be placed in a civilian position that met his restrictions. When he failed that assessment, plaintiff refused training to help him pass. Instead, he indicated that he would resubmit medical information releasing him to full-duty status. Once he submitted that information, he terminated the interactive process, relieving defendants of any liability. Thus, at that time, he was either an individual with a disability who could not perform the essential functions of the position with or with a reasonable accommodation, or he did not have a disability,

or he was a qualified individual who did not require an accommodation. Whichever it was, he cannot prevail on his failure to accommodate claim.

Finally, plaintiff's hostile work environment claim is equally deficient. To prevail on this claim he must prove that: 1) his workplace was both subjectively and objectively offensive; 2) his disability was the cause of the harassment; 3) the harassment was severe or pervasive; and 4) there is a basis for employer liability. See Lord v. High Voltage Software, Inc., 839 F.3d 556, 561 (7th Cir. 2016). "An objectively hostile environment is one that a reasonable person would find hostile or abusive." Shanoff v. Ill. Dep't of Human Servs., 258 F.3d 696, 704 (7th Cir. 2001). A hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Ford v. Marion County Sheriff's Office, 942 F.3d 839, 851 (7th Cir. 2019). The "claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Id. (quoting National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002)). This series of separate acts must be related and continuous rather than isolated incidents. Id.

To determine whether an actionable hostile work environment claim exists, the court looks to all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. Morgan 536 U.S. at 116-17. In the instant case, plaintiff identifies a few, isolated instances that he asserts support his claim. First he claims that Deputy Norton nicknamed him "the Waste" to other deputies, and would tell delivery drivers to speak to him rather than plaintiff because he was the deputy. He

10

acknowledged that Norton never made any comments directly to plaintiff, but complained that Norton would turn the heat off when he was leaving before plaintiff arrived. He also identified a complaint about deputy Lisa Schank who would come down to the dock to smoke. She would yell at delivery people making his job harder. She never made any rude comments to plaintiff, however, and he has no evidence to suggest that her behavior was based on his alleged disability. He also complains that deputy Strelecki made comments to another deputy that he did not know why ADAs were allowed on the job. He admits, however, that Strelecki never made such comments to him. He does claim that Strelecki made a comment about his transitional glasses, but has no evidence to suggest that the comment was based or connected in any way to his disability.

     Many of these comments do not support plaintiff's claim because they were not made to him, there is no evidence that they relate to his disability, and he admits that the conduct would stop (at least for some period of time) after he reported it. As a result, the court concludes that these unrelated incidents, separated by long periods of time and made by different people, were not sufficiently severe or pervasive to have altered the conditions of plaintiff's employment and did not create an objectively hostile environment. Consequently, the court grants defendants' motion for summary judgment on this claim.

## CONCLUSION

For the reasons described above, the court grants defendants' motion for summary judgment [Doc. 50] and enters judgment for defendants.

ENTER:

_____
Robert W. Gettleman
United States District Judge

**DATE:** October 28, 2021